Okay, the next case is number 2011-1129, COACH SERVICES, Incorporated v. TRIUMPH LEARNING, LLC. Mr. Zivin. Good morning, Your Honors. May it please the Court. This case presents three issues. It's a trademark opposition appeal. The most important issue, I believe, is one which is a first impression in this Court, and that is, what is the standard of trademark dilution under the Trademark Revision Act, which went into effect in 2006? I do not believe that this Court has ever interpreted that statute. Are you abandoning your tarnishment claim on appeal? We're not pursuing a tarnishment claim on appeal. We're going to limit it to blurring. Okay. Yes, Your Honor. There's two parts of a dilution claim. One part is the fame of the mark, and the second part is, in the case of blurring, whether there is blurring. It's interesting here that the Trademark Board found that the COACH trademark is famous. That's a specific finding in their decision. But they said that it's famous for the purposes of likelihood of confusion, but not for the purposes of dilution. Do you think that the standard should be the same for both, or do you agree that there is a heightened standard under dilution? I do not agree, Your Honor, that there is any heightened standard, and in fact, there's no standard for fame in a likelihood of confusion case at all. The factors in a likelihood of confusion case are generally the DuPont factors, which have been applied by the board, by this court, and by... Well, strength of the mark is one of those factors, which you could... It's not unfair for the board to use fame as a shortcut to get to that analysis, right? I don't agree, Your Honor. The strength of the mark is actually the criteria. Fame is at the very height of that particular factor. A famous mark is certainly one that's strong, but it's at the high point. The only place that the word fame appears in the Lanham Act is under the dilution section. So to the extent that the board has found that the mark is famous, it's famous. And I don't think that the word fame has a different meaning in different contexts. It only appears once in the statute. The problem, of course, is whether all famous marks are therefore automatically protected with respect to goods that we'll concede don't overlap and are significantly different. Are you telling us that because of the change in law, fame is enough? No, there are a number of criteria, Your Honor, and it has to go... That has to do with the blurring section of the trademark dilution statute, which is the following section in Section 43C. But once the board makes a finding that it's famous, then I think it's entitled to the famous criteria. You still look at all of the criteria for blurring, which has more of a breakdown as to what one considers in breaching a dilution determination. Okay, but if you find strength in the niche of a likelihood of profusion, that doesn't necessarily translate into a dilution standard of fame, right? That is correct. If you just find that it's a strong mark, that's not sufficient. But if you find that it's a famous mark, then I think it carries over to the dilution analysis. And looking at some of the evidence that you submitted with respect to dilution and some of the financial data, I found lacking. The data, some of your net sales data, et cetera, went up to the year 2008, which I found interesting, that increasing. But what happened after that? Why was no evidence submitted for 2009 in the recent years? Because the testimony period was in 2008, and that was the end of the submission of evidence. Right. But there wasn't evidence submitted for pre 2008, was there? Yes, Your Honor. There was evidence submitted for the nine year period prior to 2008. And those were the reports that the board rejected on evidentiary grounds? That is correct, Your Honor. I think they used the wrong standard of law in determining whether to accept those annual reports. Why didn't you just have your witness testify to all the years rather than specifically limiting the witness's testimony to current numbers? The witness did not testify about current numbers. She testified about what the annual sales were and said the exact numbers are in the annual reports. The annual reports are a public record. It's a New York Stock Exchange listed company and has been since 2001. All the reports are online. All the reports are in printed form. This is not something which is subject to... But they weren't obtained from online, were they? No. I mean, they have their own evidentiary rules. That's not a rule. It's something that they just came up with and they put it into a case. There's no rule that says it has to be in the form of an electronic submission. At least there wasn't any rule at the time we put it in. I've always used the printed copies because, frankly, I can read the printed copies that are published. They're nice, glossy copies and it's easier to read than for me to read something online. But the same information, the same document is a public record. It's on the SEC's Edgar Database, as any commercial lawyer would know. It's a public company. Those numbers aren't in dispute. Did your witness authenticate each of those documents? She did not authenticate each of those documents. She just said it's in our annual reports, has all the sales numbers. And then we put in the annual reports by a notice of reliance. Right. But don't you have an evidentiary issue? Because when the witness doesn't authenticate the documents and the Board has said that absent a URL that would serve for authentication purposes, there's no way to allow those records in. Your Honor, that comes from a case that the Board decided in 2010 after our evidence was already in. But even then, if you look at what the Board decided in that later case, what they said is, if the information is only available in some written form and not in electronic form, then we can't accept it. But it didn't say what would happen if it's in both published form and in electronic form. And I think what they're trying to say, although they didn't say it very artfully in my view, is that if it's a private company and there's no way one could check that information except by a witness's testimony, then we're not gonna accept it unless we have some testimony saying, these were our sales figures and here's the documents that support them. But if it's a public company, which is particularly one that's listed on the Stock Exchange and is required to submit its annual reports to the SEC, and it has submitted those on the computer, I don't see why that information isn't admissible by a notice of reliance. Keeping in mind also, Your Honor, that the Board proceedings are intended to be streamlined. They're not intended to be a full lawsuit with a panoply of witnesses and a jury. There's not even testimony, live testimony before the Board. The object is to try to keep down the cost by simply putting in the evidence that you can get a decision from the Board. Let's move to the likelihood of confusion issue. Just reading everything, it seems to me that the word coach, and let's see what you say about this, that the word coach means something to a certain element or segment of the population, but perhaps not to the entire population. Coach may, to somebody in Alabama, refer to the coach of the football team, or... So what's your answer to the district court's finding, excuse me, the TTAB's finding on likelihood of confusion? The word coach does have different meanings. In the context here, coach is a trademark of the opposer. Coach. It stands for a company which makes high quality leather goods and other goods. It's also an English word. There's no question that it's an English word. And if what we were talking about was a lawsuit where one was trying to prevent someone from using an English word in its merely descriptive sense, there would be no claim either for dilution or for likelihood of confusion because one is entitled to make fair descriptive use of an English word. So if somebody was using the word coach to describe the leader of a football team or a motor bus or an educational program, and if they were using it for an educational program to describe that program, then there is no claim for either dilution or likelihood of confusion. But this is an unusual situation where the applicant is seeking to register as a trademark, the same mark that has long been registered by the opposer. They're not claiming it's a descriptive... Very significantly. This is really where the problem arises, isn't it, in the board's decision as well, that as to whether the goods are so different that, in fact, there is scant likelihood of confusion that the maker of elegant handbags is also providing educational services. Well, it grades across and to some extent, it's a bit inconsistent because if their use was descriptive, as I said, we would not have a claim, Your Honor, but if their use is as a trademark... But you do argue that it's descriptive in your dilution case, right? No, not in the dilution case. As an alternative argument. We argue as an alternative that it's a merely descriptive use and, in fact, the Trademark Board found that it was. They found that it was merely descriptive. They made a specific claim. But that it had secondary meaning. They said  the burden was on the applicant to prove that there was substantially continuous and exclusive use. But how does it affect in any practical way your client, if there's no objection to their using it, to their using the word, to doing everything that they're doing except register the mark? That's the crux of the issue, Your Honor, and that's why we brought an opposition rather than bring an action in federal court for trademark infringement. It's the registration which troubles us. It dilutes the Coach brand, which has been built up over 50 years with substantial sales, substantial advertising, substantial recognition. They're trying to take a descriptive term and register it as a trademark, and that stands on the register, if it's allowed, as an impediment to our right to enforce the Coach trademark against others. If they wanted to continue to use it in a descriptive sense without registration, we wouldn't be here. Do you make any products that resemble educational materials? It's not a big part of the business. There are some things which might generally fall into that, but they're more in the nature of some books. You brief sites, things like DVDs and informational material, but all of that was just training supply that you give to your sales staff. You don't market educational materials, do you? We do not sell educational materials as such. And you're not in that business? We're not in that line of business. Coach does, however, publish some books. They're not... I won't call them educational books, but they are books, and they do publish some books. It is not a big part of the business, but... But they don't sell those books. There's no evidence in the record, anyway. I think they sold some, but it's a material amount. It's not a substantial sales dollar number. Prior to the registration, did you have any sales figures showing that your mark was being diluted by the sales of the educational materials? No, Your Honor. I don't think that was... The answer, in short, is no, but I don't think that's a requirement of the statute. The court... The board found that there was no dilution. The board found there was no dilution, but they did not properly apply the factors that are listed in Section 43C as to what constitutes dilution. For example, they found that the marks are different. One mark is coach in block letters, and the other mark is coach in block letters. How could those marks be different? They're identical. And they said, well... Because the mark is always associated with its use. But that's not one of the factors from a dilution analysis, Your Honor. That may be something that goes to likelihood of confusion, but it doesn't go to dilution. The factors for dilution and for blurring are set forth in the statute. The board cited no authority for that proposition. They said, well, we think the rules should be the same, but it's not the same. Dilution does not require that the goods be diluted. There would be no dilution doctrine at all, because... I agree. That's where the fame of the mark comes in. But there is no just one black or white. Either it's famous or it's not famous. There are gradations of fame as well, viewed from the viewpoint of the consuming public. Is that... I'm sure, Your Honor, that there are gradations of fame. How one concludes that, I don't know, but it seems to me, and I submit, that the Coach trademark is a very famous mark in terms of... Whenever anyone talks about famous marks, they talk about Coca Cola. I haven't seen, even in your record, anyone saying famous marks like Coach handbags. So maybe it's not as famous as Coca Cola. Well, I'll tell you, Your Honor, if you go back to 1991, the Second Circuit Court of Appeals said it was a famous mark at that time. That's exactly my concern. Is everything equally famous and therefore equally subject to dilution? No. Obviously, people say that some marks are more famous than others. The typical example always used to be Kodak. But if you look at Kodak today, it probably isn't anywhere near as well as it was at one time. So it does vary with time and with exposure and with public recognition. Let's hear from the other side. We've used up some extra time. Thank you. Mr. Hosp. Thank you, Your Honors. May it please the Court. I think it makes sense to start out talking about some of the issues that you've been talking about already. And one of them is this notion that this is an issue of first impression with respect to the aspect of fame as used in likelihood of confusion analysis and fame as used in connection with dilution analysis. I'm not sure that that's really true. I think, Judge Romano, you hit on the issue. The board made very clear that it was doing two different analyses. One analysis was the general generic analysis of fame used in a colloquial sense in some of the previous case law to determine basically on a very sliding scale, okay, how well known is this mark? Because with respect to likelihood of confusion, there is a sliding scale. The more... There is no it's famous or it's not famous. It's the better known the mark is, the more likely it is that people are going to confuse these things. And so that first analysis was really a sliding scale that the board and it makes clear in its analysis that that's really what it's doing. It's a very different analysis than the binary determination that's made in a dilution situation, particularly under the Revision Act of 2005, where it was made very clear that in fact there was a balance that was struck because there was this question of how famous do you have to be? Can you have niche fame? Can you not have niche fame? Do you have to be famous with everyone? And the determination that was made by Congress was, you know what we're gonna do? We're going to say you have to be Coca Cola. You have to be truly famous, not in a niche sense, not in one area, not with one segment of the population, but with everybody. And that's really the problem here, is basically what the board did was the board determined that, yes, this is a very well known mark. It's a famous mark in colloquial sense. And for the purposes of the likelihood of confusion analysis, putting it in the language that has been used in prior cases, but never to describe fame with respect to dilution, it's well known. So we're going to apply a fairly hard level of scrutiny here to make sure that there's no likelihood of confusion. And then later it said, okay, now we have to do the real fame analysis with respect to the Dilution Act. And that is a much stricter standard. That is a binary standard. You have to get there. You either get there or you don't. So you're saying that really this turns on the fact that the coach, not meaning the coach, the Leather Good brand, just didn't put in enough evidence? With respect to when we're talking about the dilution fame, whether or not it proved that it was dilution fame. I don't know that they could have put in enough. I suppose they could have put in enough evidence if they had done surveys, if they had done things like that. But this is a very high standard. We're talking about a very high standard. One of the things the board focused on is that their survey evidence were only related to a small age bracket. Exactly. And so had they done a survey that covered all age groups, things could have been different? If they had done a survey for the general population, absolutely. I think that the point that Your Honor made is very well taken. There are lots of different people around the country who are going to have... When you say coach, not everybody thinks, oh, they must be talking about the handbag company. And this is actually particularly true with respect to a word like coach, which is fundamentally a common English term. We're not talking about... Take Kodak, the classic example. You're not talking about a word that is a made up term of some sort. You're talking about a word that has to be used in the English language. And this is a point, and this is in the briefs that Professor McCarthy hits on in his latest edition of his treatise based on the revisions. Fundamentally, he makes the point, take for example, Amazon. Now, many of us may say Amazon is famous because a lot of us, when we think Amazon, we think of the online company, because that's probably the biggest Amazon that's out there. But the reality is, there's also an Amazon River, there's an Amazon Basin, there are the Amazons in folklore. And his point is, if you hold, for example, that Amazon is famous and therefore can prevent anybody from using Amazon under the dilution statute, what do you do with a company that, for example, comes out with hiking equipment? Where there's a very different commercial impression given by the fact that they're using Amazon with hiking equipment, because when somebody sees a shoe or finds out that there is a shoe called Amazon, they're not gonna think, okay, that must be the computer company. They're gonna think, I get it, they're drawing a connection between hiking, being outdoors, and the Amazon Basin. But isn't the purpose of the statutory change to tilt the balance in favor of the prior mark, the arbitrary mark, as Amazon might be, as coach for handbags, can be viewed as arbitrary. So there is... They have an enormous advertising budget. I think that a majority, if not almost all of the female population, associates coach with handbags. So unless... If you apply the emphasis, which is designed to make it a little bit easier to avoid dilution. After all, a newcomer into a business can pick any word in any language as the mark. So I think the other side of it is, however, that this is not a coined word, and we appreciate your argument and the board's position that coach has its own significance, but your opponent tells us, I think accurately enough, that that's a descriptive significance, not an indication of origin significance. Well, and what the board actually held... The board held... We dispute that it's descriptive. We believe that it's suggestive. Obviously, the line between descriptive and suggestive is a line that no one... That doesn't help you very much. No one has ever been able to find. But what the board did say was, to the extent that it's descriptive, it's just over the line of descriptiveness. It's not that descriptive. And that's when the board turned to the issue of secondary meaning. And we introduced an enormous amount of evidence with respect to secondary meaning. And I wanna come back to your initial point, which was the 2005 Act was, to some degree, designed to give some additional protection to famous marks. And that's true, but there was a trade off. And the trade off was, yes, but you really have to prove fame. You've gotta be McDonald's. Well, wasn't the board kind of tough on coach here, though? They said, for instance, there's just no evidence that they were famous before 2003. And yet, there's case law out there from the Second Circuit that found them to be famous well before that. Well, again, the case law from the Second Circuit was prior to the 2005 revisions when the standard for famousness was increased. No, because the standard that was being applied back in prior to 2005 was a lower standard for fame. Right. Well, the board didn't say, well, there's evidence of it, but we don't find it sufficient. The board just said, there's no evidence, and it completely ignored that case law, didn't it? It didn't draw that distinction that you're... It did not draw that distinction, but then again, it also had to look at the evidence that was before it. And the reality is that the evidence that was before it on the issue of fame was very scant, particularly given the fact that much of the evidence that a coach relied on was evidence that did not come in in an appropriate way. Yeah, the board was... They basically ruled against coach's evidentiary submissions at every turn, didn't they? Well, Your Honor, let's take one at a time, and the most important is probably the annual reports. There's a reason for having a rule that the board has, which is this. If you're using a paper copy that doesn't have any indicia, the purpose of authentication is so that everybody knows, okay, this is the real annual report. This is the one. We know we've got the right one. This is exactly how... Isn't that something that you could have stipulated too? These are documents in the public domain. You can get them from the government. Why would somebody oppose that type of governmental filing? Well, Your Honor, I don't know whether they are the same reports that were filed, and to be perfectly honest, I represent a very small company. I represent a company that is already struggling under the weight. Part of the issue of what's going on here is this is a huge company that filed an opposition that, to be perfectly honest, I don't believe should have been filed in the first place. And that forced my client to make a decision, they're going to bear what is for a smaller company. But you decided to seek the trademark. Apparently, had you not done that, we wouldn't be here, and you could be selling your educational products and everyone would be happy. Yes, but we have to be able to protect our mark against people who are directly in competition with us. The reality is... They have to protect their mark. If they hadn't filed this opposition, everybody else in the world would come after them using the mark and say they didn't make their efforts to protect it. Well, I think that they can protect their mark within the realm of those products that they actually compete with that might actually do damage. It was admitted... That's not the entire issue here, is it? Suppose that there's somebody sitting in Alabama again, a female, 28 years old, she gets promotion material from Coach Educational for Triumph, that's Coach Educational material, their first reaction may be, well, Coach, who makes my handbag, is now into education, I'm gonna buy it. This is high class, this is high end. I don't think that that's a realistic concern. It seems to stretch... That's their concern, that they're borrowing on their trademark. But there's no evidence that... There is this disconnect with the notion that they're saying that we're using a descriptive term, but we're trying to ride on their coattails. We're using a term that is admittedly related to the notion of preparing for standardized tests. And we had been using that word since 1986. We'd been using it through 1986 all the way through the beginning of the 2000s when No Child Left Behind came into being. And at that point, we were perfectly positioned for this and we have a trademark that everyone recognizes. So let's go out and let's really push and capitalize on this mark that everybody already knows us as. And part of that idea was to register the marks. Now, there's no suggestion that in any of the evidence that this was done in some way to draw a connection to the coach handbags. I think from a realistic proposition... Yes, nobody has said that there's any attempt of your client to cash in on their reputation. That's not the issue. I understand, but nobody has suggested that. And so when it comes right down to it, it's highly unlikely that when you talk about the way these products are marketed, that somebody is going to receive one of... Number one, these catalogs are all delivered to heads of schools, principals, buyers within schools. They're not marketed directly to the public. And so when somebody gets this and it says, Texas Tax Coach, and Texas Tax is the standardized test in Texas, I think it's highly unlikely. In fact, I think it stretches the imagination to think that somebody receiving that is going to think, the company that makes my handbags has somehow gone into making educational products for state specific test preparation. Yeah, the one disconnect with respect to that is you say, well, these are all teachers, but the vast majority of teachers are women. And just because someone's a teacher doesn't mean that she doesn't like nice handbags. No, that's true, Your Honor. But again, taken within the commercial context, taken within the context in which they would be viewing these, I think the likelihood that that would happen is very, very low. I think that's true. You could say that about many different trademarks, but in this instance, you're talking about somebody who's gotten a catalog that says, here are the various different math and reading, and there's nothing about that that would call to mind in any way, the notion of the elegant handbag manufacturer. I think it's very, very unlikely. With respect to the issue of likelihood of... Pardon me. With respect to the issue of secondary meaning, I just wanna point out, and this is in the papers, but I wanna stress this. Opposer makes the point that the evidence regarding the amount of sales which was in, the evidence regarding the exclusivity, the evidence regarding the amount of revenue, the number of state specific test prep books in the country wasn't given any context. I think that is really not true. In fact, there was an enormous amount of context that was built up around this, particularly with respect to the fact that, number one, this is the number one state specific test prep manufacturer in the world, or well, in the country. I can't say in the world, but in the country. And so that gives those numbers a fair amount of context. In addition, there was an enormous amount of description of the market, of these individuals, how small these... How small a number of these individuals were in the public. We're talking about marketing to thousands, perhaps, of individuals. So in that context, when you talk about $10 million worth of advertising, when all of that is directed at 6,000, 7,000, 8,000 people, you're talking about an enormous amount of marketing, and you're talking about an enormous amount of impact. I don't recall any such limitation on use in the registration. Any such limitation on use in... You say that probably so few people would ever see the mark in your client's usage, that what's all the fuss about. But you're still seeking a standard trademark registration nationwide? Yes, Your Honor. Unlimited? It's limited to the goods in the... Limited to the goods, but not limited... Suppose some enormous purveyor of educational materials decides to buy up your client, make them an offer they couldn't refuse, the trademark would go with it. The trademark would go with it. Again, that's... It's still... Because these are books that are specifically designed to teach from teacher to student... So far, but the trademark doesn't say, this usage is limited only to books in use by the teacher for certain students. No, it's for use by the teacher to students. Yes, for teaching materials. Yes, but it would still be being sold in the same channels of trade, because the limitation on the description of goods makes... The description limits it to the channel of trade sold only to teachers? As a practical matter, only because... Not as a practical matter, just what does it say? The... I don't believe such a specific limitation. If I don't remember it, I think I would have remembered it. It's not fresh in my mind. No, you are correct, Your Honor. There is no limitation on the channels of goods. So, but just for educational materials, they could become like Kaplan or one of the others where they actually market things directly to parents and students, correct? I don't think that... Well, I suppose it's theoretically possible, yes. I think, again, there was an enormous amount of evidence about how they're actually done. And I also think in terms of even Kaplan, while there's no evidence in the record on this, because we're talking about a hypothetical, but I think it's... If Kaplan were to change its name to Coach, number one, I think that the channels of trade would still be significantly different than the channels of trade used by appellant to market their luxury handbags. You're right, there could be more. There could be more people that it goes to, but the channels of trade are still going to be exceptionally different. A channel of trade is supposed to be a factor in infringement, and you're saying that's now a key factor in dilution? No, Your Honor. I was... We were talking about... I was actually talking about secondary meaning, and that led into a broader conversation. But with respect to secondary meaning, the impact of the marketing is definitely governed by how, in fact, it's used. Used at present, that was the only point that I was trying to make, that there's no limitation on a broader future use. That's true, but I was speaking with respect to secondary meaning. With respect to the secondary meaning, this marketing has a context where the relevant market here that they sell to is a very small market, and so that market has secondary meaning. And the board, but the board considered all that, and they found, I believe, that both markets, that the buyers are sophisticated buyers. So when you're selling to principals and the president of a school board and things of that nature, you're talking about sophisticated buyers, and they're the buyers of the market. So really, channels of trade, I don't think, gets you anywhere. But moving apart from that, there's an overlap on the market that both of you are selling. And I think the board found that, didn't they? Well, what the board found was that there might be some customers of ours who would also be customers of theirs, but again, in weighing the actual likelihood of confusion, they found that the channels of trades and the difference of the goods, and the difference of the commercial impression that's given by the mark, were sufficient to basically prevent any likelihood of confusion. I think we've run over. Any more questions? No, thank you. Any more questions? Okay. Thank you, Mr. House. Thank you. Mr. Rubin, you've enlarged his time by the amount we've run over, wherever that takes us. Thank you. Your Honor, talking first about the issue of descriptiveness and secondary meaning, it's interesting how the applicant's mark developed here. As Mr. Haas said, it started off by saying things like, Texas mathematics coach, and Texas English coach, or Alabama language coach. And it was clear that the use of coach in that context was a descriptive use. It wasn't a use as a trademark in 1986. If you look at the samples they put in evidence, they were all coached near the end of the expression as part of a modifier, a descriptive use of how this particular text might be used. But then they decided in 2003, and I think the board found that in the fall of 2003, to try and brand it and make coach a brand, a brand that stood alone in the word coach per se. And they wanted to promote that brand. And when they started to brand it and to become a brand, that's when they ran into the opposer coach, because now you have two coach brands out there in the marketplace, and that is a problem, not only in terms of dilution, but in terms of likelihood of confusion. Why didn't you put in more evidence as it relates to the strength of the mark or fame? You had a very narrow survey audience. There has to be more evidence that you could put in. First of all, Your Honor, if we had put in evidence about more recent surveys, if one was run for the purpose of litigation, and one is not required to run surveys for litigation, but if we did, it would have been a survey conducted in 2008, let's say, and a 2008 survey isn't going to tell us whether the mark was well known prior to 2003. You didn't do anything in connection with those earlier Second Circuit cases? There was no survey at... In those cases... Believe me, I looked for that. There was no surveys in those cases regarding recognition of coach as a mark. There was no surveys in those cases regarding likelihood of confusion, but not on... They didn't ask the question. And focus just on the hang tag. They were focused on the hang tag and whether it was likelihood of confusion and not on recognition of the trademark. How about evidence of loss of sales for dilution? There is no evidence of loss of sales due to dilution, but then evidence of loss of sales is not one of the factors in determining dilution. If... It's just not something we have any evidence of. I think the board did find that to be a persuasive factor, and this court has also found it to be that persuasive factor. I do not believe... Go ahead. Your Honor, I don't believe that this court has decided what constitutes dilution since the trademark statute was amended in 2006. And therefore, any case before that time would have been using different criteria in determining whether there was dilution. I think the intent of Congress in 2006 was to broaden the ability of owners of famous marks to stop dilution of their marks, which had always been in doubt for many years because of the inability of the relevant communities to agree on what would be an appropriate definition. And Congress attempted to do that in the Trademark Revision Act in 2006. The evidence we put in, just to further respond to Judge O'Malley, was not weak. It wasn't just a survey. The board said, well, we didn't put in much evidence on advertising. We put in over 250 ads. I could have put in, I suppose, thousands of ads. I could have taken every day's issue of the New York Times where there's a coach ad and put it in, but they would have been repetitive. The 250 were chosen to be representative and to include ads around the country, and we included ads from Miami and Philadelphia and Washington and California, as well as from New York and other places where they advertise, from magazines of general interest, like Business Week and Fortune, and things of that nature, so that we had a wide range of advertising. There were approximately 250 ads and publicity pieces that were put in. The board said there wasn't intense media attention, but there was, and the board selected a couple and put them in the opinion. In our brief, we have about 10 more that we selected to put in as further examples, and these are prior to 2003, and they don't just say, coach introduced a new handbag called Model X. They are talking about how widespread the reputation of coach was and how famous it was prior to 2003. Okay. Any more questions? No. No questions. Thank you. Thank you, Mr. Zittin and Mr. Haas. The case is taken under the board's resolution. All rise. Thank you. The honorable court is adjourned from day to day.